UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

DIALLO R. MADISON,

                                     Plaintiff,

      vs.

M. HOEY, Sergeant, Auburn Correctional                  9:03-CV-749
Facility; HANS WALKER, Superintendent,                (FJS/GJD)
Auburn Correctional Facility; EDWARD
DANN, Deputy Sup't of Security; M.
MURRAY, Corrections Officer E. FRANK,
Corrections Officer; J. EDWARD,
Corrections Officer; CAPTAIN GUMMERSON,

                                    Defendants.

_____

DIALLO R. MADISON
Plaintiff pro se
SENTA B. SIUDA
Asst. Attorney General for Defendants

GUSTAVE J. DI BIANCO, United States Magistrate Judge

**REPORT-RECOMMENDATION**

      This matter has been referred to me for Report and Recommendation by the

Honorable Frederick J. Scullin, Jr., Senior United States District Judge, pursuant to 28

U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

      In this amended civil rights complaint, plaintiff alleges that on October 30,

1999, defendants failed to protect plaintiff from a gang-related assault by another

inmate while plaintiff was walking through the main recreation yard at Auburn

Correctional Facility. (Dkt. No. 15).

      Plaintiff seeks declaratory and substantial monetary relief.  Presently before the

court is defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 86).  Plaintiff has responded in opposition to the motion and has filed a supplemental response. (Dkt. Nos. 100, 101).

**1.**   **Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted).  "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id*.  However, when the moving  party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id. See also Burt Rigid Box v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002)(citations omitted).  However, only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment. *Salahuddin v. Coughlin*, 674 F. Supp. 1048, 1052 (S.D.N.Y. 1987)(citation omitted).

**2.  Facts and Procedural History**

Plaintiff alleges that on October 30, 1999, he left the law library at Auburn Correctional Facility and was walking in the main recreation yard along the A-Block

wall between guard post numbers nine and ten. Amended Complaint (AC) at ¶ 2.
Plaintiff claims that as he was walking, he was stabbed in the neck with a sharp object
by another inmate. (AC at ¶ 2). Plaintiff states that he sustained a severe laceration,
requiring hospitalization. (AC at ¶¶ 3, 4, 11, and 12).

Plaintiff claims that defendants Hoey, Murray,[1] Edwards,[2] and Frank were
aware of another gang-related assault that had occurred on the same day, but failed to
take proper precautions to avoid the subsequent incident involving plaintiff. (AC at ¶¶
1, 6). Plaintiff also claims that defendants Walker and Dann did not properly perform
their supervisory duties by failing to assign sufficient officers to guard posts in the
main recreation yard, notwithstanding their knowledge of the large number of violent
gang members in the General Population of Auburn. (AC at ¶ 5).

Plaintiff alleges that although it was "normal procedure" to pat frisk and "scan"
inmates with an hand-held metal detector, on October 30, 1999, defendants Hoey,
Murray, Edwards, and Frank allowed inmates to enter the yard without proper
screening. (AC at ¶ 6). Plaintiff claims that he suffered serious injuries and was

---

[1] The court would note that it still appears that neither defendant Murray nor defendant
Dann have been properly served. Summonses were returned unexecuted as to both these
defendants, and it does not appear that service was again attempted. (Dkt. Nos. 19, 20). The
Federal Rules require that a defendant be served within 120 days of filing the complaint. FED. R.
CIV. P. 4(m). The failure to serve a defendant within 120 days of filing the complaint may be a
ground for dismissal of the complaint. *Id.* This court mentioned this in its previous Report-
Recommendation, however, at that time, the court was recommending dismissal based on the
statute of limitations, thus, I did not decide the failure to serve issue. This court still does not need
to consider the failure to serve because it is recommending dismissal on the merits in any event.

[2] The amended complaint lists this defendant as "J. Edward." however, it is clear that this
defendant spells his name "Edwards," and the court will refer to this defendant by the proper
spelling of his name.

subsequently diagnosed with post-traumatic stress disorder (PTSD), causing plaintiff to have problems sleeping, nightmares, flashbacks, and general emotional distress. (AC at ¶ 16).  Plaintiff alleges that he suffers the effects of the October 1999 incident to the present time.

Defendants originally moved to dismiss, or in the alternative for summary judgment, based on the statute of limitations. (Dkt. No. 27).  This court recommended granting the motion, however, the recommendation was not accepted,[3] and the case was remanded to me for further proceedings on the merits. (Dkt. No. 36).  Defendants have now moved for summary judgment, arguing that plaintiff has not exhausted his administrative remedies, he has alleged insufficient personal involvement by some defendants, and that plaintiff's failure to protect claim has no merit. (Dkt. No. 86).

3.    **Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal action.  This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004).

---

[3] The court must point out that in his objections to the Report-Recommendation, plaintiff made completely **new allegations** regarding the statute of limitations than he had made before this court.  In plaintiff's objections to this court's report, he alleged that he had filed a previous action in the Southern District of New York and that the statute of limitations should be tolled. Plaintiff never made this argument before me, and in fact, argued that the statute of limitations should have been tolled because he had a "continuing injury" from the assault and that he had a "lack of knowledge of the injury until the injury was diagnosed." *Compare* (Dkt. No. 29) (Plaintiff's Response in Opposition to Defendants' Motion to Dismiss) *with* (Dkt. Nos. 32, 33)(Objections to Report and Recommendation).

Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675. The failure to exhaust is an affirmative defense that must be raised by the defendants. *Scott v. Del Signore*, 2005 U.S. 6070, *12-15 (W.D.N.Y. Feb. 18, 2005) (citing *inter alia Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004)).  As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *Id.* at * 12-13 (citing *Giano,* 380 F.3d at 675).

In *Jones v. Bock*, 549 U.S. 199, 127 S. Ct. 910, 922-23 (2007), the Supreme Court held that in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Id.* (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).  In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.  In *Woodford*, the Court concluded that the inmates did not properly exhaust their administrative remedies when their grievances were dismissed because the inmates had missed the deadlines set forth in the grievance procedure. *Id.* at 93.

The grievance procedure in New York is a three-tiered process.  The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. COMP. CODES R. & REGS., tit. 7 §§ 701.5(a)(1) and (b).  At the time that plaintiff's incident arose, an inmate had fourteen (14) days within which to file a

complaint.[4]  An adverse decision of the IGRC may be appealed to the Superintendent of the Facility.  *Id*. § 701.5(c).  Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id*. § 701.5(d).  The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a)(Inmate's Responsibility).

In this case, there is no dispute that plaintiff missed the deadline for filing a grievance.  The incident occurred on October 30, 1999.  Defendants state that there is no way to obtain copies of any grievance that may have been filed by plaintiff at the time of the incident because those documents are destroyed after four years.  However, the CORC does have records of appeals filed during that time period, and has no record of any appeals to the CORC of a grievance filed by plaintiff in 1999 regarding this incident. Lindquist Aff. & Ex. A.  Even if plaintiff brought a grievance, he would not have exhausted the administrative remedies unless he appealed the denial to the CORC. *Woodford, supra.*  Plaintiff does not argue otherwise.

Plaintiff states that he filed a grievance on December 7, 2001, that was not answered by defendants. Pl. Ex. 8. (Dkt. No. 101).  Plaintiff appears to have waited

---

[4] The court would first point out that the regulations were re-numbered in 2006.  The court will cite to the new regulation numbers.  The original regulation number for the time to file grievances was section 701.7(a)(1), and provided a fourteen day time limit. *See Tackman v. Goord*, 2005 U.S. Dist. LEXIS 42654, *51 (W.D.N.Y. Sept. 26, 2005)(citing regulations).  The regulations have been amended to allow inmates twenty-one (21) calender days from an alleged occurrence within which to file a grievance, and the deadline appears in section 701.5. N.Y. Civ. Prac. L. & R., tit.7, § 701.5(a)(1).

until October 16, 2002 to complain to Commissioner Glenn Goord that plaintiff's grievances were being "sabotaged." Pl. Ex. 9.  However, in a letter dated October 31, 2002, Deputy Commissioner Lucien Leclaire, Jr. told plaintiff that although there was no record of his December 7, 2001 grievance, plaintiff had filed *sixteen* grievances from June 17 to October 15, 2002 that had all been addressed. Pl. Ex. 10.

Plaintiff waited until June 9, 2003 to file another grievance. Pl. Ex. 11.  In that grievance, plaintiff explained that he was attempting to exhaust his administrative remedies pursuant to *Porter v. Nussle*, 534 U.S. 516 (2002).  Plaintiff's grievance was denied, as "untimely," stating that plaintiff had not met "the requirements" set forth in *Porter.* Pl. Ex. 12.  There was no provision for appeal of that denial. *Id.*  On June 21, 2003, plaintiff tried to file another grievance, challenging the fourteen day time limit for filing grievances. Pl. Ex. 13.

This grievance was also denied, and the Superintendent found "no mitigating circumstances." Pl. Ex. 14.  The Central Office Review Committee (CORC) affirmed the denial on July 30, 2003, stating that plaintiff never filed a grievance after the 1999 incident, but that the "IGP Supervisor" had reviewed the "mitigating" evidence and determined that there was "no reason to file the grievance at this time." Pl. Ex. 15. The CORC also found that there was no reason to change the fourteen day policy. *Id.*

Prior to *Porter v. Nussle*, the Second Circuit had held that the exhaustion requirement did not apply to individualized cases of constitutional violations such as excessive force. *See Nussle v. Willette*, 224 F.3d 95, 106 (2d Cir. 2000), *rev'd sub nom. Porter v. Nussle*, 534 U.S. 516 (2002).  Plaintiff alleges that he was not aware

7

that he had to exhaust a claim of failure to protect until the Supreme Court decided *Porter v. Nussle.* By then, plaintiff had already missed the deadline for filing a grievance. When he attempted to comply with the requirement, his grievance was dismissed.

Plaintiff argues that these 2003 grievances are sufficient for exhaustion purposes, and that the "defendants' subordinates made sure that no administrative remedies were not [sic] available to me after I mentioned in my complaint the reason why I was attempting to exhaust my administrative remedies." (Dkt. No. 97 at 6). Plaintiff seems to be arguing that although the corrections officials had the authority to allow plaintiff to file a late grievance, they did not do so intentionally to prevent plaintiff from exhausting his administrative remedies, which would prevent him from filing a federal action. *Id.*

Even after *Woodford*, courts have continued to hold that some exceptions apply to the exhaustion requirement, particularly where defendants' conduct is such that they will be estopped from asserting the defense. *See Smart v. Goord*, 04 Civ. 8850, 2008 U.S. Dist. LEXIS 16053, *5-7 (S.D.N.Y. March 3, 2008)(citing *Ziemba v. Wezner*, 366 F.3d 161, 162 (2d Cir. 2004)(plaintiff claimed, *inter alia*, that prison officials beat him, threatened him, and denied him grievance forms)); *Amador v. Superintendents of the Dep't of Correctional Svcs.*, 03 Civ. 650, 2007 U.S. Dist. LEXIS 89648, *14-24 (S.D.N.Y. Dec. 4, 2007)(discussing viability of exceptions to exhaustion after *Woodford v. Ngo*).

At the same time that the Second Circuit decided *Giano*, it also decided four

8

other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement and specifying various instances in which the requirement could be waived or excused. *See Hemphill v. State of New York*, 380 F.3d 680 (2d Cir. 2004)(remanding case to determine if defendant's alleged threats constituted "special circumstances" justified plaintiff's failure to exhaust); *Abney v. McGinnis*, 380 F.3d 663 (2d Cir. 2004)(whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman*, 380 F.3d 691 (2d Cir. 2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride*, 380 F.3d 649 (2d Cir. 2004)(complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

Pursuant to these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006)(citing *Hemphill*, 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether special circumstances justify the inmate's failure to comply with the exhaustion requirement. *Id.*

Without making specific rulings, or by ruling in the alternative, courts have continued to assume that there are exceptions to the exhaustion requirement. In *Macias v. Zenk*, 495 F.3d 37 (2d Cir. 2007), the Second Circuit cited *Woodford*, and also considered whether the defendants' actions would have estopped them from

9

asserting the defense of non-exhaustion.  In *Amador*, the district court cited *Woodford*, recognizing that the "viability" of the Second Circuit's three-part inquiry might have been called into question, but continued to use the *Brownell/Hemphill* factors to determine whether the exhaustion requirement could be waived.

It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement.  In fact, based upon the concurring opinion in *Woodford*, it appears that the Second Circuit decisions have ***not*** been overruled in that respect.  In his concurring opinion in *Woodford*, Justice Breyer specifically noted that two circuits, the ***Second*** Circuit and the Third Circuit that have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts [in *Woodford*] have concluded that the PLRA's proper exhaustion requirement is not absolute." *Woodford*, 126 S. Ct. at 2393 (citing *Spruill v. Gillis*, 372 F.3d 218, 232 (3d Cir. 2004); *Giano v. Goord*, 380 F.3d 670, 677 (2d Cir. 2004))(Breyer, J. concurring).

Justice Breyer then stated that on remand, the lower court should "similarly" consider any claims that the inmate might have concerning whether his case "falls into a ***traditional exception that the statute implicitly incorporates***." *Id.* (emphasis added). This statement implies that there are still exceptions that a court may consider.  Thus, this court will proceed to consider whether plaintiff asserts any of the "traditional" exceptions to the exhaustion requirement.

In this case, the administrative grievance procedure was certainly "available" to plaintiff in the literal sense.  In *Webb v. Goord*, 340 F.3d 105, 111-12 (2d Cir. 2003),

*cert. denied*, 540 U.S. 1110 (2004), the Second Circuit held that *Porter* was

retroactive.  However, in *Rodriguez v. Westchester County Jail*, 372 F.3d 485, 487 (2d

Cir. 2004), the Second Circuit excused the exhaustion requirement when plaintiff had

filed his case prior to the Supreme Court's decision in *Porter*.  In *Hernandez v. Coffey*,

2006 U.S. Dist. LEXIS 52066, *12 (S.D.N.Y. July 26, 2006), the district court rejected

plaintiff's argument that the exhaustion requirement should be waived because *Porter*

was decided after the incident in his case, and Second Circuit law did not require

exhaustion of his particular claim at the time of the incident.  However, in *Rivera v.*

*Pataki*, 04 Civ. 1286, 2005 U.S. Dist. LEXIS 2747, *41-46 (S.D.N.Y. Feb. 14, 2005),

the district court excused plaintiff's failure to exhaust based on his reasonable

interpretation of the law prior to the Supreme Court's decision in *Porter* and based

upon defendants' actions.

   The plaintiff in *Hernandez* argued as plaintiff does in this case, that he filed a

grievance, but that he received no response. *Id.* at *9.  Rather than appealing the

failure to respond, Hernandez waited a year and then wrote a letter to the chairperson

of the IGRC complaining of the failure. *Id.*  The court found that the IGRC's failure to

respond did not relieve the plaintiff of his responsibility to appeal that failure to the

next level. *Id.* (citations omitted).  Plaintiff in this case acted in the same fashion.  He

states that he filed a grievance on December 7, 2001, but waited until October 16,

2002 to write a letter to Commissioner Goord, complaining that plaintiff's grievances

11

were being "sabotaged."[5]   The regulations specifically provided that if the inmate did not receive a response within the time limits, he could appeal to the next step.  Even after Deputy Commissioner Leclaire's letter, plaintiff waited until June of 2003 to file another grievance.  Thus, plaintiff in this case cannot argue that defendants prevented him from exhausting his 2001 grievance.

The court must determine whether there are other "special" circumstances which would excuse the plaintiff's failure to exhaust.  Plaintiff keeps arguing that he was suffering from Post Traumatic Stress Syndrome (PTSD) and that this would excuse his failure to file grievances as well as lawsuits.  However, plaintiff's PTSD did not stop him from filing the grievance that he alleges that he filed in 2001.  It did not stop him from filing his complaint in the Southern District of New York in 2002, and apparently did not stop him from filing sixteen other grievances between June of 2002 and October of 2002 as stated in Deputy Commissioner Leclaire's letter of October 31, 2002.  The fact that plaintiff has some mental impairment, regardless of the cause of that impairment does not automatically make him unable to function or to file papers.

Plaintiff also makes a vague argument that prison officials denied his 2003 grievance as untimely so that he would be unable to bring an action in court, thus, making it defendants' fault that he did not exhaust.  There is no basis for plaintiff's conclusory assertion.  This incident happened in October of 1999, and plaintiff had

---

[5] As the court stated above, the letter from Deputy Commissioner Leclaire pointed out to plaintiff that his grievances were not being sabotaged, since he had filed sixteen grievances between June and October 2002 that had all been addressed.

plenty of time to file a grievance, regardless of the fact that he may have been transferred to other facilities.  When he finally filed his grievance in **_2003_**, the prison officials were not incorrect in dismissing the grievance as untimely and not allowing plaintiff an "extension" of four years to complain about the failure to protect.[6]  Based upon a consideration of all the factors articulated in _Hemphill_ and _Brownell_, this court finds that there is a basis to hold that plaintiff has failed to exhaust, and that the exhaustion requirement should not be waived.  However, since there is conflicting authority regarding this issue, the court will not recommend dismissal solely upon the failure to exhaust, and will proceed to consider the merits of plaintiff's claim.

## 4.   <u>Failure to Protect</u>

Even if plaintiff had exhausted his administrative remedies or could be excused from that requirement, his claim would fail on the merits. An inmate has a right under the Eighth and Fourteenth Amendments to be spared "the 'unnecessary and wanton infliction of pain.'" _Hendricks v. Coughlin_, 942 F.2d 109, 112 (2d Cir. 1991)(citation omitted).  An inmate's allegation that a defendant was deliberately indifferent in failing to protect him from the violence of other inmates states a claim under section 1983. _Id._ at 113.

---

[6] The court notes that in _Rivera v. Pataki_, the court stated that after the Supreme Court's decision in _Porter_, DOCS was allowing inmates to use the decision as a "mitigating circumstance" which would entitle them to file a late grievance. _Rivera_, 2005 U.S. Dist. LEXIS 2747 at *42-43.  The court also notes that the _Rivera_ court had ordered plaintiff to return and exhaust his administrative remedies.  Referral from the court was also a "mitigating circumstance" that would justify a late grievance. _Id._  When DOCS continued to deny the grievances as untimely, the court then found that defendants actions had prevented plaintiff from filing grievances. _Id._  _Rivera_ is distinguishable from this case.

In order to state an Eighth Amendment claim for failure to protect an inmate, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, **and** prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  The plaintiff must show that prison officials **actually knew of and disregarded** an excessive risk of harm to the inmate's health and safety.  *Id.* at 837.  The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists and the defendant must also draw that inference.  *Id.*

An isolated omission by corrections officers generally does not support a claim for deliberate indifference absent circumstances involving evil intent, recklessness, or deliberate indifference. *Coronado v. Goord*, 99 Civ. 1674, 2000 U.S. Dist. LEXIS 13876, *10-11 (citing *Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1985)).  Plaintiff may allege a constitutional claim by alleging that the substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and that the officials being sued were exposed to information concerning the risk and thus, must have known about it. *Id.* (citing *Farmer*, 511 U.S. at 842-43). Thus, the court must analyze this plaintiff's case both as it relates to a specific danger to plaintiff as well as a danger to the inmate population in general.

In *Coronado*, the court discussed the requirements for making out a deliberate indifference claim, both with respect to plaintiff in particular and with respect to a general danger of attacks in the yard at Green Haven Correctional Facility. *Id.* at *13-20.  The court stated that plaintiff would have to plead facts establishing that there

14

were numerous other inmate-on-inmate attacks in the yard; the attacks posed a

substantial risk of harm to inmates; the defendants knew about these attacks; and

despite their knowledge of these attacks, failed to take steps to reduce the harm. *Id.* at

*17.  Plaintiff would also have to show that any steps that the defendants took to

alleviate the harm to inmates in general would have reduced the risk to Coronado, and

that had they taken such steps, Coronado would not have been attacked. *Id.*

The court in *Coronado* dismissed the complaint because, notwithstanding that

fact that the plaintiff had been the victim of an attack years earlier, the plaintiff had

not alleged sufficient information to show what the level of other violence was,

whether it was similar enough to the attack on Coronado, what types of weapons were

used, and whether the installation of metal detectors would have prevented the assault.

*Id.* at  *17-18.

In contrast to *Coronado*, in *Warren v. Goord*, 476 F. Supp. 2d 407, 410-13

(S.D.N.Y. 2007), plaintiff's claim survived a motion to dismiss when he claimed that

the defendants, including the supervisory defendants, knew about assaults and

stabbings that regularly took place in the yard, knew that an inmate had been killed in

the yard, knew that weapons were stored in the yard, and knew that the use of metal

detectors would prevent such attacks from taking place. *Id.*  In a motion to dismiss,

however, all the plaintiff's allegations are assumed to be true. *See Erickson v. Pardus*,

127 S. Ct. 2197, 2200 (2007).  The court in *Warren* held that assuming the facts stated

in Warren's complaint to be true, the defendants' alleged tolerance for weapons in the

yard and the resulting inmate attacks, could rise to the level of deliberate indifference

15

because the defendants' conduct would show a disregard for a substantial and pervasive risk of violence. *Id.*

In his amended complaint, plaintiff in this case alleges that defendants Hoey, Murray, Edwards, and Frank were all aware of a "gang" assault that occurred at approximately 1:00 p.m. on October 30, 1999 along the C-Block wall at Auburn Correctional Facility. AC ¶ 1. Plaintiff further states that defendants Superintendent Walker and Deputy Superintendent of Security Dann had a "policy or custom" of not assigning corrections officers to guard posts in the main recreation yard, while "knowing" that there are a large number of violent gang members circulating in the General Population at Auburn. AC ¶ 5. Plaintiff also claims that on October 30, 1999, defendants Hoey, Murray, Edwards, and Frank allowed inmates into the main yard without being searched or scanned for weapons. AC ¶ 6.

Plaintiff claims that because there was an unrelated gang assault earlier[7] on the day that he was assaulted, the defendants were deliberately indifferent in not preventing the assault on plaintiff. In response to the motion for summary judgment, in an effort to show knowledge of the danger, plaintiff states that when he arrived at Auburn in June of 1999, he advised defendant Hoey and another corrections officer that plaintiff had a "distrust" for gang members. (Dkt. No. 101 at ¶ 11). Plaintiff also claims that he told defendant Hoey about plaintiff's "criminal case." *Id.* Plaintiff alleges that he is in a category of inmates that is subject to attack by this particular gang, and that the defendants should have known this and should have acted to

---

[7] It is not clear that such an assault took place.

16

prevent the assault.

First, the court would point out that negligence does not state a claim under section 1983. *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986).  Even if defendants were negligent in staffing the yard or in failing to properly search the inmates entering the yard, this would not amount to a constitutional violation.  The mere failure to post a guard does not rise to the level of a constitutional violation even if the guard's presence could have avoided the attack. *Fair v. Weiburg*, 02-CV-9218, 2006 U.S. Dist. LEXIS 71083, *19-20 (S.D.N.Y. Sept. 28, 2006)(citing *inter alia Grant v. Burroughs*, 96 Civ. 2753, 2000 U.S. Dist. LEXIS 12917, *9 (S.D.N.Y. Sept. 8, 2000)(negligent supervision of the area was insufficient for constitutional violation)).

Defendants have submitted a copy of plaintiff's "Arrival Interview" at Auburn Correctional Facility, dated June 16, 1999. Defs. Ex. E.  This exhibit is a document signed by plaintiff stating that he believes that he had "no need for protection from anyone here at Auburn Correctional Facility." *Id.*  In this case, plaintiff claims that he spoke to defendant Hoey about plaintiff's distrust for gangs, but that defendant Hoey told plaintiff that they had the gangs under control at Auburn. (Dkt. No. 100 at 7). Even assuming that plaintiff did have this conversation with the defendant, it is unclear how plaintiff's comment regarding his "distrust" for gang members and statement about his particular crime approximately ***four months prior*** to the assault would have imparted any knowledge to defendants of a serious risk of harm to

17

plaintiff.[8]  Additionally, even if there had been an attack earlier the same day in another part of the prison, there is absolutely no connection to a specific danger or any danger to the plaintiff.

Additionally, plaintiff only alleges that he told defendant Hoey and another officer who is not a defendant in this case about plaintiff's "distrust" of gangs.  There is no indication that any of the other defendants were aware of this conversation, which took place four months prior to the assault.  This, coupled with the fact that plaintiff signed his 'Arrival Interview" document, stating that he was not worried about anyone at Auburn, shows that the defendants were not aware of a substantial risk of harm to plaintiff.  Plaintiff also does not allege that he mentioned his concerns to anyone else any time prior to or even after the assault.

After the attack on plaintiff, defendant Hoey recommended plaintiff for involuntary protective custody. Defs. Ex. H.  Defendants have also submitted the transcript of plaintiff's involuntary protective custody hearing. Defs. Ex. G.  The hearing officer was defendant Gummerson, and during the hearing, plaintiff specifically stated that he disagreed with the recommendation, and even if he had been attacked by gang members, he did not feel that he was in any danger. *Id.* at 3.  Plaintiff stated "I don't even know, I was coming out of the law library that day and there was,

---

[8] Plaintiff has submitted a newspaper article about the "Bloods." Pl. Ex. 16.  The newspaper article was written after the assault on plaintiff, discussed the gang in general, and had nothing to do with gang activities in correctional facilities. Pl. Ex. 16.  The article was about Suffolk County and the problems that it was having with this gang. Plaintiff may have been attempting to show that the "Bloods" did not like a particular type of crime, making plaintiff a target for the gang's violent activities.  There is picture of a "Blood's" rule book that includes a statement that "Bloods" will not "tolerate" a certain type of criminal activity.

[sic] couple of guys swung on me, and the next thing I know . . . ." *Id.* at 2.  Defendant Gummerson continued to question plaintiff and asked him whether he could go to the yard and not have a problem. *Id.* at 4.  Plaintiff stated that he did not think so. *Id.*  As a result of the hearing, defendant Gummerson ***did*** place plaintiff in ***involuntary*** protective custody. *Id.* at 6.

Plaintiff never mentioned his fear of gangs at the hearing or his apparent belief that he was being targeted for assault because of his particular crime of conviction. He certainly had the opportunity to do so at the time.  Plaintiff now states that he was "under intense psychological and physiological reactivity associated with Posttraumatic Stress Disorder" and really did not know what he was saying at the involuntary protective custody hearing. (Dkt. No. 101 at ¶ 6).  On the date of the incident, plaintiff also signed a form stating that he believed that he was not in need of any protection, and that there was no threat to his life by remaining in general population. Defs. Ex. C at 17.  Plaintiff also signed a statement that he did not wish to pursue criminal charges against the other inmates involved and did not want the State Police to investigate the matter. *Id.*

Plaintiff also claims that an earlier gang-related assault during the day would have alerted the defendants to the need for increased security or that plaintiff was in danger.  A review of the watch commander's log for the day of the assault shows no inmate-on-inmate assault occurring on October 30, 1999 until the assault on plaintiff. Pl. Ex. 17 at 16-17.  Plaintiff now claims that in the days prior to his assault, there were "39 incidents" logged. (Dkt. No. 101 at ¶ 12).  It is unclear to what "incidents"

plaintiff is referring or how these "incidents" would have alerted defendants about a danger to plaintiff or to inmates in general.  A review of plaintiff's Exhibit 17, containing log book entries from October 23, 1999 until October 30, 1999 shows that there certainly were "incidents," however, most of these incidents were assault on staff or drug-related incidents. *See* Pl. Ex. 17.

On October 23, 1999, drugs were found in one inmate's cell, and an inmate spit on some corrections officers. *Id.* at 1.  On October 24, 1999, there was a use of force regarding a strip-frisk, and some more drugs were found. *Id.* at 3-4.  On October 25, 1999, an inmate threw a food tray at a corrections officer, and more drugs were found during the pat-frisk of an inmate. *Id.* at 6.  On October 26, 1999, there was another assault on staff during a pat-frisk of an inmate. *Id.* at 8.  Only a single inmate was involved. *Id.*  On October 27, 1999, an inmate who was scheduled to be transferred to the Central New York Psychiatric Center became aggressive with the corrections officers. *Id.* at 11.  On October 28, 1999, an inmate started a fire in his cell and was sent to the Mental Health Unit. *Id.* at 13.  No injuries were reported for the inmate or staff. *Id.*  On October 29, 1999, a contraband weapon was found during an inmate's cell-frisk. *Id.* at 15.  The only unusual entry for October 30, 1999 is the attack on plaintiff. *Id.* at 17.[9]

There is absolutely ***nothing*** in the log book entries for the week prior to the October 30, 1999 attack on plaintiff that involves more than one inmate per incident

---

[9] There is an eighteenth page of this exhibit, but it is a duplicate of page seventeen. Pl. Ex. 17 at 18.

or that involves an inmate-on-inmate attack. As stated above the unusual incidents that involved force were inmates who became aggressive with corrections officers. Whether these inmates were "gang" members or not, there is no indication of a substantial risk to plaintiff himself or to inmates in the yard in general.

Plaintiff claims that the entries in the log book, indicating that misbehavior reports were "reviewed" on a particular day, indicates that more incidents occurred than indicated in the log entries. Plaintiff states that the only way to know what occurred is to review the misbehavior reports to determine whether they involved gang members activities. It is true that some of the entries refer only to the review of misbehavior reports, and there is only a total number reviewed with the number of each type of report, either Involuntary Protective Custody (IPC), Tier II or Tier III misbehavior reports.

The court would first note that it is unclear why the log book would contain some entries specifically describing assaults, but list others within the entry stating only that misbehavior reports were reviewed. Additionally, not every Tier II or Tier III misbehavior report involves violence. However, even assuming that the log book does not always specifically describe an incident, plaintiff does not allege that any of those other alleged incidents involved him or occurred anywhere near him, or how these other incidents would have alerted these defendants to a danger to plaintiff.

Plaintiff also claims that defendant Hoey's statement on the IPC recommendation that when plaintiff was assaulted, other "known gang members" ran to get involved in the altercation, shows that defendant Hoey was aware of the identity

21

of these gang members.  While defendant Hoey may have been aware that certain inmates were members of a "gang," this does not necessarily show that he was deliberately indifferent to plaintiff's safety or security.  Additionally, it does not appear that defendant Hoey was in any way involved in the incident or was at the yard when the incident occurred.  The Unusual Incident report showed that the corrections officers who responded to the incident were defendants Edwards and Frank and Sergeant Martens (not a defendant in this case). Defs. Ex. C at 1-3.

Even assuming that the guards assigned to posts were not where they were supposed to be, this is ***at worst*** negligence by the officers, and there is no indication that any supervisory officers would have known that someone was not going to be at his post or in the vicinity of an assault that took place suddenly. *Daniels, supra*; *Davidson, supra.*  In fact, the amended complaint states that the "normal procedure" was for inmates to be scanned or searched prior to their entry into the yard. AC ¶ 6.  If the "normal procedure" is to search and scan inmates, the failure to do so on one occasion may be negligent, but it does not show deliberate indifference.

Plaintiff also submits an article from "DOCS Today" from June of 2001, stating that there were 945 inmate on inmate assaults in 2000. (Dkt. No. 100).  Plaintiff, however, fails to include the context of his citation.  The article was written by former Commissioner Glenn Goord, and he was commenting that this was the ***lowest number in twelve years***.  He was further stating that even though the numbers were high, the decline had been due, *inter alia* to, staff diligence and professionalism. *Id.*  Clearly, this article does not show that there was a "policy" of failing to assign guards

properly, amounting to deliberate indifference to inmates' safety.  In fact, the article shows that DOCS was diligently attempting to reduce the incidence of both inmate-on-inmate violence as well as assaults on staff by inmates.

The court would finally note that in plaintiff's response to defendants' motion for summary judgment, he includes his statement of "Genuine Issues of Material Fact." (Dkt. No. 100).  In this statement, plaintiff alleges for the *first* time that defendants Edwards, Frank, and Murray witnessed plaintiff being surrounded and did not respond until plaintiff was severely injured. Statement of Material Fact at ¶ 5. Plaintiff claims that they did not respond until he was "walking away from the scene." *Id.*  This allegation is not in plaintiff's amended complaint, and he has never made such a claim anywhere.

A review of the documents generated as a result of the incident show that the guards responded immediately upon seeing the incident, and that "several orders were given to break, and they complied." Defs. Ex. C (Unusual Incident Report).  Based on all the evidence of record, this court finds that there is no genuine issue of material fact regarding plaintiff's failure to protect claim, and the complaint may be dismissed.

## 5.   Respondeat Superior

Finally, the court notes that defendants Walker, Dann,[10] and Gummerson are all supervisory personnel, who had no direct involvement in the alleged failure to protect. It is well-settled that the personal involvement of a defendant is a pre-requisite to the award of damages in a section 1983 action. *See Provost v. City of Newburgh*, 262 F.3d

---

[10] It does not appear that defendant Dann was ever served with process in this case.

146, 154 (2d Cir. 2001).  Liability may not be based on the theory of *respondeat superior*. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.  A supervisory official is said to have been personally involved if that official directly participated in the infraction.  *Id*.  A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong.  *Id*.  Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue.  *Id*.  Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event.  *Id*.

Plaintiff in this case acknowledges that these defendants are supervisory personnel, but claims that they are "personally" involved because either they were grossly negligent in managing subordinates who allowed the assault to happen or they had a "policy" of failing to man certain posts, resulting in a substantial risk of danger to inmates.  Defendant Gummerson was the hearing officer in plaintiff's IPC hearing, and was not involved in the incident itself.  Plaintiff seeks to maintain defendant Gummerson as a defendant because his name appears in the watch commander's log as having reviewed the log.  The court would point out that defendant Gummerson was not always the supervisor who reviewed the misbehavior reports or the watch

24

commander's log itself.

Defendant Walker was the Superintendent of Auburn.  Plaintiff states that the watch commander's log indicates that defendant Walker called the facility and was "briefed."  Plaintiff apparently reads a great deal into this innocuous statement. *See* Pl. Ex. 17 at 2-3.  The watch commander's log book contains many references to individuals being "briefed" when they took over for the previous supervisor or individuals being "briefed" when they started their shifts.  "Briefing" simply means giving someone else information and does not necessarily mean that these corrections officers or their supervisors were being told about assaults or other unusual incidents.

Finally, as stated above, plaintiff himself states that it was "normal procedure" to scan or search inmates for weapons prior to entering the yard, however, the defendants did not do so on October 30, 1999.  If the normal procedure was not followed, it is unclear how the supervisory defendants would have known that the procedure was not being followed.  Thus, plaintiff's conclusory allegations are not supported by the documentary exhibits that he submits and there is insufficient evidence to raise a genuine issue of material fact regarding the personal involvement of defendants Walker, Dann, and Gummerson.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 86) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report.  Such objections

shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: September 15, 2008

Hon. Gustave J. DiBianco
U.S. Magistrate Judge